## Case No. 1,647.

### BOOTH et al. v. L'ESPERANZA.

[Bee, 92.] [1]

District Court, D. South Carolina. March Term, 1798.

SALVAGE—RESTORATION OF VESSEL.

A vessel in distress, met with at sea, and brought into the port of a neutral power, must be restored, after payment of salvage, to those who were in possession of her when she was met with.

[Cited in Packard v. The Louisa, Case No. 10,652.]

Before BEE, District Judge.

The actors, in this case, owners and mariners of the American schooner Ranger, libel for salvage, L'Esperanza, her crew, and a negro slave on board. The facts on which they ground their claim, and which arise out of the evidence and pleadings, are, that on the 28th of February last, in latitude 27, 36, between the little bank of Bahama, and the Florida shore, the crew of the Ranger discovered L'Esperanza making a signal of distress. That, suspecting her to be a privateer, they kept on their course; but, perceiving that a boat from the Esperanza with only two hands on board was following them, hove to. When the boat came up, there were in her a Spanish boy, and a negro called Williamson, who said that the Esperanza had been captured, sixteen days before, off the Moro castle, by the Charlotte, a privateer belonging to New Providence, who put this boy and two negroes into the prize, and ordered her to that port. That they were driven into the gulf stream by a gale of wind, had been drifting about for sixteen days, not knowing where they were; and had neither provisions, water, compass, nor chart. Captain Booth supplied them with all these, and they then returned to their vessel. But the Spanish boy and negro Williamson came back, and requested they might remain on board the Ranger; saying that the other negro, who was a slave, refused to quit the vessel, or give her up. Booth, however, was apprehensive of some risque; sent them back to their vessel, and made sail to proceed on his voyage. Finding they still followed him, he again lay to, and let them come up, when they all consented to abandon the vessel to Booth. He accordingly sent his mate, Cooke, to take charge of her, together with the Spanish boy, and the negro slave; and kept the other negro on board of the Ranger, in lieu of his mate. Cooke navigated her safely into this port; and now they demand a liberal salvage for their trouble and care. The British consul has filed a claim on behalf of the captors; the consul of Spain claims on behalf of the original owners. A third claim is interposed by Cooke, the mate, who navigated this vessel into this port; and who demands salvage to himself, on account of the

[1] [Reported by Hon. Thomas Bee, District Judge.]

risque he ran, and the fatigue he underwent: alleging that the safe arrival of the vessel was solely owing to him. Both the consuls admit that salvage is due.

Restitution is contended for to the captors, on the ground of possession, (by virtue of the capture, and of the laws of war) at the time the Ranger met with their prize. The Spanish consul claims, because the vessel was in possession of a Spanish subject, as commander thereof, at the time the libellants found her at sea. It is insisted that no other white person was on board; that the two negroes were under his orders; and that they were endeavouring to make the best of their way to the Havanna; that she is still Spanish property, in possession of Spanish subjects. In discussing this question, the first point to be considered is, in whose possession was the Esperanza found by the Ranger; the last possessor being the only one whom neutral powers can notice. Great stress has been laid by the counsel for the Spanish consul, on the doctrine laid down in Molloy and other writers, that, before condemnation, there can be no change of captured property. But this doctrine is clearly set aside by the case of The Mary Ford [M'Donough v. Dannery], decided in the supreme court of the United States, 3 Dall. [3 U. S.] 188. That vessel had been captured from British subjects, and remained some time (above twenty-four hours) in possession of the French captors, who, for want of hands to man her, endeavoured to set her on fire without success, and, finally, abandoned her. In that situation she was found at sea by an American vessel, and carried into Boston. She was libelled in the district court for salvage; and, subject to this, restitution was claimed by the French and British consuls, on behalf of the French captors, and original owners, respectively. The district court decreed one third for salvage; and ordered restitution of the remainder to the owners. But this decree was reversed by the circuit court, and afterwards by the supreme court, who said that, "immediately on the capture, the captors acquired such a right as no neutral nation could impugn, or destroy." I must consider this decision as my guide in every similar case; and I readily assent to it, more especially as the question of prize, or not, is thereby evaded. But it is said that putting the Spanish boy on board, though as prizemaster under the British, alters the question: for that as he was still a Spanish subject, and has, on oath, declared an intention to carry the vessel into a Spanish port, he must be considered as holding her for the Spanish owners. The two negroes, on the contrary, maintain that they held her for the captors. But it is said that, as slaves, they were incapable of possession for any purpose whatsoever. This doctrine, however, goes too far; 1st. Because by the laws of this state, a slave authorized by his master to do an act, which a slave could not

otherwise do, is justified, provided the master avows the order. 2dly. Because, as most of our coasters are navigated by slaves, and frequently commanded by a slave, the owners would be continually exposed to loss of their property, in case a vessel should be blown to sea, as is often the case. There can be no doubt, however, that slaves in such a circumstance would be allowed to represent their owners, and to prove their property. It was determined in this court on solemn argument, in the case of Stone v. Godet, that the owner of a slave could maintain a suit for his wages as mariner on board a coaster. The general policy of the country as to slaves must, therefore, admit of exceptions in particular cases.

It will now be necessary to inquire whether any and what circumstances took place on board the Esperanza, amounting to a recapture, or divestment of the British right. Admitting the boy Pelaiz to be a Spanish subject, yet he was found on board acting under British authority. The copy of the commission had not, indeed, been filled up; but at the bottom of it is a memorandum to shew that he was prizemaster of the Esperanza, a prize to the Charlotte privateer of New Providence, and consigned to Edward Sherman of Nassau. Under this authority he acted on board, under this he claimed to be commander, and, as such reported himself and vessel to the captain of the Ranger, when he first went on board. No expression or hint ever escaped him as being in possession for the Spanish owners, or as being a Spanish subject, till after his arrival in Charleston. Every thing on his part impressed the crew of the Ranger with the conviction that the Esperanza was a prize, bound to Providence. But Pelaiz says in his evidence that he always meant to carry the vessel into a Spanish port, if possible; and that he had no other object in view when he went on board. Yet, in the next breath, he acknowledges that he looked on himself as master, after the first day; the negro being then in command. Under the peculiar circumstances of this case, no evidence of the negroes being admissible in this court, we must search for the real fact by comparing the former conduct of this boy with his present declarations. When first he went on board the Ranger he called himself prizemaster of this vessel, and said she was bound to Providence. But it is said he was compelled to do so, lest the negroes should discover his intentions. If this was the case, he had not such a command on board as enabled him to go where he pleased, contrary to the consent of the owners. And this is further evinced by the conduct of the old negro, who, after Pelaiz and the other had offered to give up the vessel to the Ranger, still refused to go any where but to Providence. Pelaiz, in fact, relinquished his command to the black man, who, by his own account, held her for the British. As to concealment of his intentions, it was, at any rate, unnecessary; for the mate proves, and Pelaiz confirms it, that when, in his conversation on board the Ranger, he called the vessel a prize to the British, the negro Williamson was in a different part of the vessel, and could not hear what was said. Captain Booth says that their course was for Providence when he met them. I shall, therefore, set aside the evidence of this boy, as insufficient to destroy the right of the British captors; and shall dismiss the claim of the Spanish consul: but without costs, as he acts merely in a public capacity.

It is agreed that salvage is due, and it remains only to fix the quantum. The Esperanza was in distress for want of provisions and water, but was staunch, and seaworthy, and cannot be in any manner considered as a wreck. By changing one seaman for another, she made land in four days. On the other hand, she owed much to the Ranger, for necessary supplies, and the persons on board were relieved from great fatigue, and great possible danger. Much of this, however, would have been effected by being merely furnished with necessaries, and with compass and chart. These would, probably, have enabled the three persons on board to reach a port; so that I cannot consider her as an abandoned vessel. Nevertheless, I think great credit is due to captain Booth and his crew for the services they rendered; and I decree that they receive one fourth of the vessel and cargo as salvage. Let the mate, under the circumstances of this case, receive a share equal to that of the captain of the Ranger.